**Certiorari Denied, April 8, 2013, No. 33,943**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number:  2013-NMCA-057**

**Filing Date:  September 26, 2012**

**Docket No. 31,324 (consolidated with Docket No. 31,374)**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH AND**
**FAMILIES DEPARTMENT,**

　　　**Petitioner-Appellee,**

**v.**

**LAURA J.,**

　　　**Respondent-Appellant,**

**and**

**In the Matter of ELIJAH J., a child,**

**and concerning**

**COLIN D., REBECCA LYNN F., and**
**DIANA C.,**

　　　**Intervenors.**

**consolidated with Docket No. 31,374**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH AND**
**FAMILIES DEPARTMENT,**

　　　**Petitioner-Appellee,**

**v.**

**LAURA J.,**

**Respondent,**

**and**

**In the Matter of ELIJAH J., a child,**

**and concerning**

**COLIN D.,**

**Intervenor-Appellant,**

**and**

**DIANA C. and REBECCA LYNN F.,**

**Intervenors.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Michael E. Vigil, District Judge**

Children, Youth & Families Department
Oneida L'Esperance, Chief Children's Court Attorney
Rebecca J. Liggett, Children's Court Attorney
Santa Fe, NM

for Appellee

Caren I. Friedman
Santa Fe, NM

for Appellant Laura J. (No. 31,324)

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward Ricco
Melanie B. Stambaugh
Jocelyn Drennan
Albuquerque, NM

for Appellant Colin D. (No. 31,374)

Cuddy & McCarthy LLP
Aaron Wolf
Santa Fe, NM

2

for Intervenors Rebecca Lynn F. and Diana C.

Johnna L. Studebaker
Santa Fe, NM

Guardian ad Litem

**OPINION**

**SUTIN, Judge.**

**{1}** Laura J.'s (Mother's) and Child's cousin, Colin D., and Mother separately appeal the termination of Mother's parental rights to Elijah J. (Child). We have consolidated the two appeals and consider in this Opinion the issues presented by Mother and by Colin. In addition to the propriety of the termination of Mother's parental rights, this appeal raises questions of Colin's standing and whether the Children, Youth and Families Department's (the Department) failure to consider Colin for placement of Child requires this Court to remand for further permanency hearings.

**{2}** We hold that clear and convincing evidence supported the termination of Mother's parental rights and that Mother was afforded due process in regard to the termination proceedings and determination. We affirm the judgment terminating Mother's parental rights. In addition, to the extent Mother may have a legal interest recognized under due process with respect to placement of Child with relatives, we determine that our remand of the placement issue satisfies any due process concerns. Last, we also hold that Colin has standing to appeal and that the Department was obligated but failed to consider Colin as a potential placement for Child requiring the Department on remand to consider forthwith whether Colin is an appropriate relative with whom to place Child. Our remand of the placement issue does not require reversal of the termination of Mother's parental rights.

**BACKGROUND**

**{3}** On December 9, 2008, the Department received a referral alleging that Mother was abusing drugs and physically neglecting Child; the referral included allegations of inadequate food and lack of supervision. Two days later, on December 11, Delfina Medina, an investigator with the Department, went to Mother's home. According to Ms. Medina, Mother stated that she had a history of domestic violence, dating back five months, with a former boyfriend. Mother also reportedly admitted using crack about one month prior to Ms. Medina's visit and using marijuana about one week prior to the visit. Before concluding the home visit, Ms. Medina requested that Mother visit the Department's office "first thing the next morning" for the purposes of continuing the investigation and submitting to a urinalysis. The next day, December 12, 2008, a snowstorm occurred, and Mother "called in and stated that she would not make it to the Department that day and would reschedule the appointment by phoning [Ms.] Medina another day, due to her not having a phone that she could be

3

reached at." On January 5, 2009, through Mother's mother, Ms. Medina requested that Mother visit the Department on January 7, 2009, but Mother cancelled the appointment because Child was sick. Mother agreed to allow Ms. Medina to drive her to SED Labs for a urinalysis. When Ms. Medina arrived at Mother's home, Mother was not there. Later that day, Ms. Medina, along with a detective from the Santa Fe Police Department, did an unannounced home visit, due to Ms. Medina's concerns about Mother's slurred speech earlier that day. The detective, who arrived before Ms. Medina, reportedly told Ms. Medina that it seemed that "they" (Mother and her two guests) were smoking marijuana in the apartment. The detective removed drug paraphernalia from the home and granted the Department a forty-eight-hour hold on Child, who was taken to the Department's office by Child Protective Services supervisor Gabrielle James. Child was approximately nine and one-half months old at that time.

{4}     The Department workers noticed that Child's hands and face were dirty, that he had scratches and abrasions on his hands and shins, and a rash on his buttocks. He also had what appeared to be a bump on the back of his head, a mark on his back, and an older rash on his lower back. He had only one shoe and no socks. He was dressed in a shirt that was too big. Due to concerns regarding Child's physical condition and concerns that he was unable to sit up, unable to hold his head up, and "was not very responsive[,]" Child was taken to the hospital. At the hospital, a drug screen revealed that Child tested positive for opiates. Child also had impetigo, and he was "very hungry[.]"

{5}     Child was discharged from the hospital the same day he was taken there. Once discharged from the hospital, Child was placed in foster care. On January 8, a social worker from the hospital contacted the Department and reportedly stated that, due to his having tested positive for opiates, Child should not have been discharged from the hospital and that if Child showed any signs of withdrawal, he needed to be taken back to the hospital immediately. Also on January 8, 2009, the foster parent reported that Child was very limp and would not hold his head up. On January 9, 2009, the foster parent took Child to a follow-up medical appointment, at which the physician determined that the markings on Child's body were from bed bugs.

{6}     Pursuant to the foregoing facts, presented as part of the Department's affidavit for ex parte custody order, the district court found probable cause to believe that Child was abused or neglected as defined in NMSA 1978, Section 32A-4-2 (1999) (amended 2009). Accordingly, the court signed an ex parte custody order on January 9, 2009, in which it ordered Child to remain in the Department's custody until further order of the court.

{7}     On January 20, 2009, the district court held a temporary custody hearing at which the court ordered continued departmental custody of Child and adopted the Department's initial assessment plan. Among other things, the initial assessment plan noted that Child had been placed with a foster family in San Miguel County while relative placement was being explored, and it called for Mother to provide a list of relatives to be considered for relative

placement. Additionally, it called for Mother to participate in a psychological evaluation, as well as in a parenting assessment, and undergo random urinalyses.

**{8}** On January 23, 2009, the case was transferred from the Department's Santa Fe office to its Las Vegas, New Mexico office because Child's alleged father was related to an employee of the Santa Fe office. On January 30, Mother participated in an intake with Crossroads, a women's residential recovery center in Carlsbad, New Mexico. Crossroads accepted Mother into its program and indicated that she could be admitted in March 2009.

**{9}** On March 3, 2009, the district court held an adjudicatory and dispositional hearing at which Mother pleaded no contest to allegations of neglect. The court found that the Department had made and continued to make reasonable efforts to reunify Child with Mother. The court adopted the Department's family treatment plan and added additional requirements of Mother, including that (1) she attend the Crossroads program and participate in services and, upon release, follow aftercare recommendations; (2) after attending the Crossroads program, she be assessed for work skills and be referred to appropriate job training; (3) she get her GED; and (4) she participate in individual counseling.

**{10}** On March 16, 2009, Mother was admitted to Crossroads, and Child was placed there with her. At the time of her admittance to Crossroads, Mother was one month pregnant with her second child. At Crossroads, Mother underwent a psychological evaluation and a comprehensive clinical and psychosocial assessment. She participated in parenting classes, substance abuse therapy, and individual therapy. She also interacted with Child to learn to address Child's developmental delays.

**{11}** Mother was scheduled to graduate from the Crossroads program on July 15, 2009; however, she was unsuccessfully discharged from the program on June 8, 2009, "due to her manipulative and detrimental behaviors to the group." In its discharge summary, Crossroads noted, among other things, that Mother had a very difficult time focusing on her addiction and the need for changes in her life; that "[s]he focused most of her time on external factors and manipulated the staff and her group members constantly"; and that she "did work on her behaviors but would relapse and continue to repeat the same negative behaviors." Having been discharged from Crossroads, Mother returned to Santa Fe, where she resumed working on a treatment plan through the Department. Child was placed with foster parents, Rebecca Lynn F. and Diana C. (Foster Parents) in Las Vegas on or about June 10, 2009.

**{12}** On August 11, 2009, the district court held an interim review. The court ordered the implementation of a modified treatment plan. With an overarching goal of reunification, the treatment plan included interim goals of Mother obtaining and maintaining a safe and stable home environment, becoming employed or otherwise demonstrating an ability to provide for Child, attending individual therapy, demonstrating and maintaining sobriety, and learning and demonstrating effective parenting skills. Additionally, the treatment plan listed the assessment of relative placement as an "individual child plan item" and it stated, as a "step" toward this goal, that the Department would "seek and explore relative placement."

5

**{13}** Child's alleged father having been dismissed from the case, the Department transferred the case back to its Santa Fe office, and on August 13, 2009, it assigned the case to senior permanency planning worker, Emily Martin. Among other services, Ms. Martin referred Mother to the Community Infant Program to provide in-home, one-on-one, parenting services to Mother. According to Ms. Martin and her supervisor Delphine Trujillo, for the first month or two after the case was transferred back to Santa Fe, Mother made efforts to comply with her treatment plan. In mid-September 2009 and continuing through December, Mother's compliance with the treatment plan "turned downhill."

**{14}** Mother's therapist, Carolyn Burns, testified that, after mid-September, she was no longer convinced that Mother was sober. In mid-September, when Mother's boyfriend got out of jail, Mother, who had been attending weekly individual therapy sessions and making progress, according to her therapist became "more erratic[.]" Ms. Burns explained that although Mother would regularly contact her to schedule therapy, Mother was typically a "no show" for the appointments.

**{15}** In October 2009, because Mother was "very far into her pregnancy[,]" the Department arranged for Mother to have individual therapy by phone, offered her transportation when she needed it, and decreased the number of required weekly Narcotics Anonymous meetings. Later in October 2009, Mother's second child, Francisco, was born. On October 27, 2009, the district court held a first permanency hearing. The court adopted, as partial findings of fact, the Department's permanency hearing report and additionally found that Mother believed that since the birth of Francisco she would be able to make increased efforts on her treatment plan. The Department explained that it was not filing for termination of parental rights at the October hearing, because it chose instead to request "an extension of time to work with [Mother] on . . . reunification."

**{16}** Among other facts in the October permanency report, the Department noted that Mother had made "minimal progress toward[] alleviating the causes of [Child's] removal and placement in [the Department's] custody[.]" The Department noted that Mother had "just begun to address her substance abuse in outpatient therapy and by attending [Narcotics Anonymous] meetings"; and that Mother had "made a notable effort in obtaining her sobriety and consistently tested negative for substances during the month of September" 2009. It also noted, however, that Mother's progress in addressing her substance abuse had been slow, and she had "only begun to attend the services designed to help her maintain her recently [attained] sobriety." The Department further noted that Mother had "not been able to provide a safe and stable living environment for herself or" for Child. The Department also explained that Mother "seem[ed] to be doing the bare minimum in all recommended services[,]" that her lack of progress toward the desired outcomes listed on her treatment plan were "largely due to her lack of commitment to [Child] and her failure to follow through with treatment recommendations on a consistent basis[,]" as well as to Mother's relationship with her boyfriend, which continued to be her priority. The Department further noted that Mother minimized her boyfriend's drug use, criminal history, and domestic violence history.

6

**{17}** According to Ms. Martin, after the first permanency hearing in October 2009, "everything turned south." Mother was not making it to all of her visitations, she would call to schedule urinalyses and then fail to take them, she was missing therapy appointments, and she was missing her parenting appointments by failing to be at home when she was scheduled to meet with the Community Infant Program workers. In early December 2009, during a scheduled home visit with Mother, Ms. Martin became concerned for Francisco's safety, and she determined that it was necessary to file a report. The cause of Ms. Martin's concern was her observation of pills lying outside of an open bottle on the counter and ashtrays containing either tobacco or marijuana roaches; also Mother's urinalysis taken on the day of the home visit revealed a very high level of THC. *Cf. Buffett v. Vargas*, 1996-NMSC-012, ¶ 3, 121 N.M. 507, 914 P.2d 1004 (recognizing that THC is the active ingredient in marijuana).

**{18}** On January 8, 2010, the Department held a family centered meeting regarding Francisco. Colin attended the meeting, as did Child's maternal grandmother. According to the Department's notes, following the meeting Colin "said he would definitely be considered as placement or support to [maternal grandmother] to help care for Francisco." Later in January 2010, Colin became a kinship guardian to Francisco, and in April 2010, Colin was licensed as a foster parent with the Department.

**{19}** On April 19, 2010, the district court held a second permanency hearing related to Child. The court found, among other things, that Mother had not attended therapy for several months, that after having stayed sober for a few months prior to the first permanency hearing, the few drug tests that she had taken in 2010 had reflected very high levels of THC, and that she had not provided the Department with proof of her attendance of substance abuse group meetings. The court ordered Child's permanency plan to be changed from reunification to adoption. It also ordered the Department to continue to provide services to Mother to assist her in adjusting the conditions that rendered her unable to properly care for Child and ordered Mother to continue to participate in the treatment plan. Additionally, the court found that

> the Department identified the maternal grandmother as a relative and . . . considered placement with her, but that placement was not feasible . . . . There was no evidence concerning whether other relatives have been located or considered for placement. If [Mother] has concerns regarding other relatives, a hearing should be requested within sixty days.

The court's order, hereinafter referred to as "the second permanency order," was not filed until November 29, 2010.

**{20}** Four months before the second permanency order was filed, on July 27, 2010, Colin filed a pro se motion to intervene for the purpose of adopting Child. On August 17, 2010, the Department filed a motion to terminate Mother's parental rights to Child. In addition to detailing Mother's history of non-compliance with the treatment plan and with Department-

7

arranged services, the Department listed as grounds for termination that Mother had "recently revealed that domestic violence [was] a problem between her and [her boyfriend]." The Department's motion also stated that because Mother's boyfriend was a household member, the Department requested that he participate in services but, as of the date of the motion, he had yet to comply with that request. He had, however, submitted to a urinalysis which revealed "an extremely high level of THC."

**{21}** On September 10, 2010, the court filed a stipulated order granting Colin status as an intervenor. The details of this order are discussed later in this Opinion. Beginning on October 25, 2010, and for nine non-consecutive days ending on February 17, 2011, the court held a hearing on the Department's motion to terminate Mother's parental rights. Among the parties who attended the hearing were Colin and Mother, both represented by their counsel.

**{22}** Following the termination hearing, in his closing argument, Colin argued that the Department failed to follow legal mandates to locate, notify, and consider family members, other than Child's grandmother, as potential placement for Child. He also argued that the Department "knew that relative search was an integral part of family reunification as a matter of law and public policy" and that despite having been trained on the law, the Department chose not to follow it. And he argued that the Department "failed utterly in making reasonable efforts, or any efforts, to reunify [Child] with his family[.]" These and other of Colin's arguments were related to and made in support of his request that the district court order the Department to arrange for Child to be placed with a relative, Colin himself being a viable option for such placement.

**{23}** Mother's closing argument focused mainly on her theory that the Department had failed to make reasonable efforts to assist her in meeting the treatment plan goals. Specifically, Mother pointed to the difficulties created by the Department's decision to place Child in a Las Vegas foster home. Mother also argued that the Department failed to understand her psychological and cognitive difficulties and, consequently, it failed to provide her with an adequate treatment plan. Additionally, "as [a] separate and novel attack on reasonable efforts and placement specifically at both the permanency stage of the case and [at the termination stage,]" Mother incorporated all of the argument, theory, and issues that had been raised by Colin.

**{24}** On April 8, 2011, the court filed a decision that reflected its findings of fact and conclusions of law that provided a basis for termination of Mother's parental rights. The court concluded that there existed clear and convincing evidence that the causes and conditions of the neglect and abuse were unlikely to change in the foreseeable future despite the Department's reasonable efforts and that it was in Child's best interest to terminate Mother's parental rights. Additionally, the court concluded that "[t]he failure of the Department to investigate and place . . . [C]hild in a relative placement [was] not relevant on the issue of whether . . . [Mother's] parental rights . . . should be terminated." The court's

decision was followed, on April 21, 2011, by the issuance of its final judgment terminating Mother's parental rights.

**{25}** Colin and Mother separately appeal from the judgment terminating Mother's parental rights. Mother's appeal is based on three contentions of error: (1) the Department failed in its duty to make reasonable efforts to place Child with a relative, (2) the Department failed to make reasonable efforts to assist Mother to adjust the causes and conditions that led to Child's custody with the Department, and (3) her constitutional right to due process was violated.

**{26}** Colin's appeal is based on his contention that the district court erred in ordering a change in Child's permanency plan from reunification to adoption when the Department had failed to make reasonable efforts to identify and locate relatives who could potentially have served as placement for Child. Colin maintains that without the court first having made the requisite finding that the Department had made such reasonable efforts with respect to placement of Child with him, the case should not have progressed to the termination stage. As indicated in our discussion that follows, we agree, in part, with Colin.

**DISCUSSION**

**{27}** Because our analysis of the issues presented by Mother and Colin requires interpretation of the Abuse and Neglect Act (the Act), NMSA 1978, §§ 32A-4-1 to -34 (1993, as amended through 2009), we begin our discussion with an overview of the relevant provisions of the Act, as well as relevant provisions of the New Mexico Administrative Code. "The express purpose of the . . . Act is to: (1) make the best interest[s] of the child paramount; (2) preserve the unity of family, to the maximum extent possible; and (3) to assure that the parties receive a fair hearing and their constitutional and other legal rights are recognized and enforced." *State ex rel. Children, Youth & Families Dep't v. Maria C.*, 2004-NMCA-083, ¶ 23, 136 N.M. 53, 94 P.3d 796 (alteration, internal quotation marks, and citation omitted). The provisions of the Act should be interpreted in such a manner as to effectuate its stated purposes, including, when possible, preservation of family unity. *See State ex rel. Children, Youth & Families Dep't v. Benjamin O.*, 2007-NMCA-070, ¶ 34, 141 N.M. 692, 160 P.3d 601 (discussing interpretation of the Children's Code).

**{28}** When a child is taken into custody by the Department and a court has found that the child was abused or neglected, the Department determines the placement of the child. 8.10.8.13(A)(1), (C) NMAC (11/15/05). At the outset, and applying to all subsequent changes in placement, there exists a preference for placement with qualified relatives of the child. 8.10.8.13(C)(4) NMAC; 8.10.8.11(C)(5) NMAC (8/15/07). A "relative," as defined by Regulation 8.10.8.7(II) NMAC (11/15/05), "is someone connected to another person by blood or marriage within the fifth degree of consanguinity." *See also* 8.10.8.7(Q) NMAC (providing that "'[f]ifth degree of consanguinity' includes brother, sister, grandparents, aunt, uncle, niece, nephew, first cousin, mother-in-law, father-in-law, sister-in-law, and brother-in-law, as well as documented godparents").

9

**{29}** If, at the dispositional stage, the court finds that a child is abused or neglected, the court will order the Department to implement a court-approved treatment plan, with which the child's parent is ordered to cooperate. Section 32A-4-22(C). Following an initial review of the disposition, the court will hold a permanency hearing at which the court shall order one of five permanency plans for the child. Sections 32A-4-25(A), -25.1(A), (B). The enumerated permanency plan options are:

>      (1)      reunification;

>      (2)      placement for adoption after the parents' rights have been relinquished or terminated or after a motion has been filed to terminate parental rights;

>      (3)      placement with a person who will be the child's permanent guardian;

>      (4)      placement in the legal custody of the [D]epartment with the child placed in the home of a fit and willing relative; or

>      (5)      placement in the legal custody of the [D]epartment under a planned permanent living arrangement, provided that there is substantial evidence that none of the above plans is appropriate for the child.

Section 32A-4-25.1(B). "The court shall hold permanency hearings every twelve months when a child is in the legal custody of the [D]epartment." Section 32A-4-25.1(G).

> If the court adopts a permanency plan other than reunification, the court shall determine whether the [D]epartment has made reasonable efforts to identify and locate all grandparents and other relatives. The court shall also determine whether the [D]epartment has made reasonable efforts to conduct home studies on any appropriate relative expressing an interest in providing permanency for the child. The court must ensure the consideration has been given to the child's familial identity and connections. If the court finds that reasonable efforts have not been made to identify or locate grandparents and other relatives or to conduct home studies on appropriate and willing relatives, the court shall schedule a permanency review within sixty days to determine whether an appropriate relative placement has been made. If a relative placement is made, the subsequent hearing may be vacated.

Section 32A-4-25.1(D). The required findings provided in Section 32A-4-25.1(D) are related to certain regulatory provisions that govern the actions of the Department. Particularly, Subsection (F) of Regulation 8.10.3.16 of the Administrative Code, which mandates that the Department "shall make every effort to identify, locate[,] and notify fit and

willing relatives for consideration of placement of a child in custody who requires out of home placement." 8.10.3.16(F) NMAC (3/31/10) (amended 4/29/11 and 2/29/12); *see also* 8.10.3.7(CC) NMAC (3/31/10) (amended 4/29/11 and 2/29/12) (explaining that the term "protective services division" a term that is used in 8.10.3.16(F) NMAC, "refers to the protective services division of the . . . [D]epartment, and is the state's designated child welfare agency"). Additionally, we note Regulation 8.10.7.17 NMAC (3/31/10), entitled "notifying relatives[,]" reads as follows:

> A. [The Department] shall exercise due diligence to identify and notify adult relatives of a child's removal within thirty . . . days of the removal. The notice shall inform relatives of their option to become a placement resource for the child.

> B. If the parent is unable or unwilling to provide the [Department] worker with names and contact information of relatives, the children's court attorney shall inform the court and ask the court to question the parents about relatives. The children's court attorney shall include in the court order that the parents will provide names of relatives, for possible relative placement, to [the Department] and attorneys of record five . . . days from the date of the hearing.

> C. At the permanency hearing, when the court adopts a plan other than reunification, the children's court attorney shall request that the court determine whether . . . the [D]epartment has made reasonable efforts to identify and locate, and conduct home studies of any appropriate relative expressing an interest in providing permanency for the child.

**{30}** When abuse and neglect proceedings reach the second permanency hearing stage, "the presumption is that adoption or other permanent placement is in the child's best interest." *Benjamin O.*, 2007-NMCA-070, ¶ 29 (internal quotation marks and citation omitted). Once the court has ordered a plan of adoption, "the course is set for termination[.]" *Maria C.*, 2004-NMCA-083, ¶ 30. When a termination hearing is held, a parent's parental rights will be terminated if the court finds by clear and convincing evidence that, despite reasonable efforts by the Department "to assist the parent in adjusting the conditions that render the parent unable to properly care for the child[,]" the conditions and causes of the neglect or abuse are unlikely to change in the foreseeable future. Sections 32A-4-28(B)(2), -29(I). "Clear and convincing evidence is defined as evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Children, Youth & Families Dep't v. Lance K.*, 2009-NMCA-054, ¶ 16, 146 N.M. 286, 209 P.3d 778 (alteration, internal quotation marks, and citation omitted).

**{31}** When a parent appeals from an order terminating her parental rights, we will affirm the district court if its findings are supported by clear and convincing evidence, and we will

resolve all conflicts in the evidence in favor of the Department. *See In re Termination of Parental Rights of Reuben & Elizabeth O.*, 104 N.M. 644, 648, 725 P.2d 844, 848 (Ct. App. 1986); *see also State ex rel. Dep't of Human Servs. v. Williams*, 108 N.M. 332, 335, 772 P.2d 366, 369 (Ct. App. 1989) ("Even in a case involving issues that must be established by clear and convincing evidence, it is for the finder of fact, and not for reviewing courts, to weigh conflicting evidence and decide where the truth lies.").

## I.     The Termination of Mother's Parental Rights Was Proper

**{32}**     Mother contends that there was insufficient evidence to support the district court's conclusions that the Department made reasonable efforts to assist her to adjust the conditions and causes that led to Child's custody with the Department. Mother argues that by placing Child in Las Vegas when Mother lived in Santa Fe, the Department created a "near-insurmountable obstacle in Mother's path" because Las Vegas was not close enough to Mother's residence to facilitate visitation. Mother also argues that the Department failed to create a treatment plan that accommodated her learning disorder and cognitive limitations. According to Mother, "the district court failed to take into consideration the deleterious results of the Department's lack of efforts."

**{33}**     Mother conceded at the termination hearing, and she likewise concedes in her briefing to this Court, that owing to a lack of financial and other resources, she was not, and is not, ready to parent Child. Although we agree with Mother that her having admitted that she was incapable of parenting Child may not, alone, provide a sufficient basis upon which to affirm the termination, there existed otherwise sufficient evidence to support the court's order. Having provided an overview of the case in the background section of this Opinion, we narrow our discussion, in this section, to the evidence that bears upon Mother's two particularized insufficiency of the evidence claims.

## A.     The Proximity of Child's Placement in Las Vegas to Mother's Residence in Santa Fe Did Not Affect the Outcome in This Case

**{34}**     The district court found that:

> []     [w]hile the case was being managed out of Las Vegas, the Department transported [Child] to Santa Fe twice a week for supervised visits . . . . [Mother's] mother provided transportation for additional visits. . . .

> []     Upon transfer of the . . . case to the Santa Fe office in August of 2009, [Mother] was set up with two weekly supervised visits for an hour and a half at either the Department's Santa Fe or Las Vegas offices. Transportation was provided by [the Department], [Mother's] mother[,] and the [F]oster [P]arents. [Mother] was not prejudiced by . . . [C]hild remaining in Las Vegas after she left Crossroads and moved to Santa Fe. The results of the case would have been the same.

12

The court's finding was supported by the testimony of Nadine Flores, the Las Vegas permanency plan worker who was assigned to Mother's case. Ms. Flores explained at the termination hearing that, although the distance between Child's placement and Mother's residence "wasn't ideal," the Department "went out of [its] way to ensure that [Mother] would have the visits with [Child]." Ms. Flores explained that she, personally, or another Department employee would transport Child twice a week to Santa Fe because Mother did not have transportation and that other times, Mother would receive transportation to Las Vegas to visit with Child there.

**{35}** Also, Ms. Martin testified that when she was the acting permanency worker on Mother's case, hour-and-a-half-long visits were scheduled twice each week and were held either in Santa Fe or Las Vegas. Mother's apartment at that time was less than one mile from the Department's Santa Fe office, so Mother was able to walk to the visits held there. Child was transported by the Department or the Foster Parents for the Santa Fe visits. And, if Mother needed transportation, the Department provided it; however, Mother's mother also provided transportation.

**{36}** Based on the testimony regarding visitation and transportation by both the Las Vegas and Santa Fe permanency workers, we reject Mother's argument that the lack of proximity between her residence and Child's placement created an insurmountable obstacle for Mother. The foregoing testimony was sufficient to "instantly tilt[] the scales" in the court's mind that the results would have been the same regardless of Child's placement in Las Vegas. *Lance K.*, 2009-NMCA-054, ¶ 16 (defining clear and convincing evidence). We will not reweigh the evidence. *See In re R.W.*, 108 N.M. at 335, 772 P.2d at 369. We affirm the court's findings relevant to this issue.

**B.     The Department Made Reasonable Efforts to Assess and Accommodate Mother's Cognitive and Emotional Limitations**

**{37}** The district court found that:

> [Ms.] Burns, M.A., of Integrative Therapies, provided individual therapy to [Mother]. Ms. Burns used dialectical behavior therapy, the treatment of choice for personality disorders. They worked on emotional literacy and mindfulness training. . . . She was aware of [Mother's] history of ADHD and special education, and that her treatment approach would not have been different if she had had access to a more thorough psychological evaluation.

The court's finding was directly supported by Ms. Burns' testimony, which included statements to the same effect.

**{38}** Additionally, the court found that Mother "entered . . . Crossroads, a residential treatment center . . . . [where she] completed the first phase of the program[, but] . . . was discharged unsuccessfully . . . on June 8, 2009." The record reflects that while Mother was

13

at Crossroads, she underwent a psychiatric evaluation and a psychosocial assessment. When Mother was discharged from Crossroads, Ms. Flores contacted its staff to learn why. Ms. Flores specifically raised the issue of whether Mother's "mental disabilities" made it difficult for Mother to complete the program. Crossroads staff reportedly told Ms. Flores the work is modified to accommodate the disabilities of the residents and that Mother was capable of doing the work, but she was lying and using her learning disabilities as an excuse to not complete the program.

**{39}** Based on the foregoing evidence, the district court could conclude, by clear and convincing evidence, that the Department had made reasonable efforts to accommodate Mother's cognitive and emotional limitations by providing referrals to services that were tailored to her particular needs. That Mother did not fully participate in or cooperate with the services does not render the Department's efforts unreasonable. *See State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 23, 132 N.M. 299, 47 P.3d 859 (explaining that "[w]hat constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent"); *see also In re Termination of Parental Rights of Eventyr J.*, 120 N.M. 463, 471, 902 P.2d 1066, 1074 (Ct. App. 1995) (stating that when the Department has made reasonable efforts, further efforts are not required). Mother's argument that the Department failed to accommodate her limitations provides no basis for reversal.

## II.    Mother's Due Process Contentions

**{40}** "Parental rights cannot be terminated without due process of law." *State ex rel. Children, Youth & Families Dep't v. Browind C.*, 2007-NMCA-023, ¶ 20, 141 N.M. 166, 152 P.3d 153. Mother argues that her right to procedural due process was denied by the Department's alleged failure to make reasonable efforts to assist her. Mother also argues that she was deprived of procedural and substantive due process by the Department's failure to place Child with relatives. We review Mother's due process claims de novo. *State ex rel. Children, Youth & Families Dep't v. Lorena R.*, 1999-NMCA-035, ¶ 22, 126 N.M. 670, 974 P.2d 164.

**{41}** Mother contends that application of the due process balancing test described in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), supports a holding in her favor. *See Browind C.*, 2007-NMCA-023, ¶ 31 (applying the *Mathews* test in the context of a termination of parental rights case). *Mathews* provides three factors to be employed in resolving the issue whether constitutional due process dictates were sufficiently upheld. 424 U.S. at 334-35. The first factor requires identification of "the private interest that will be affected by the official action[.]" *Id.* at 335. Next, we are to consider "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards[.]" *Id.* Finally, we consider the state's interest, including, among other considerations, "the function involved[.]" *Id.*

14

**{42}**   We first examine Mother's argument that she was denied due process by the Department's failure to make reasonable efforts to assist her.  Mother correctly argues that she has a fundamental right to parent Child.  *See State ex rel. Children, Youth & Families Dep't v. Amanda M.*, 2006-NMCA-133, ¶ 22, 140 N.M. 578, 144 P.3d 137 (noting that parents have a fundamental right in the care, custody, and management of their children). "The [Department] has an equally significant interest in protecting the welfare of children." *State ex rel. Children, Youth & Families Dep't v. Brandy S.*, 2007-NMCA-135, ¶ 23, 142 N.M. 705, 168 P.3d 1129 (alteration, internal quotation marks, and citation omitted). Therefore, our decision rests upon our conclusion under the second *Mathews* factor.  *Brandy S.*, 2007-NMCA-135, ¶ 23.  In terms of the Department's efforts to assist her to overcome the causes and conditions that rendered her unable to parent Child, Mother does not make any argument related to the second *Mathews* factor.  And, as indicated in the previous section, we agree with the district court's determination that the Department's efforts in this regard were reasonable.  The second *Mathews* factor therefore weighs in favor of affirming the court's judgment.  Accordingly, we conclude that Mother was not deprived of due process because the Department's efforts were reasonable.

**{43}**   We turn now to Mother's argument that she was denied due process by the Department's failure to place Child with relatives.  Mother contends that by failing to make reasonable efforts to place Child with a relative, the Department interfered with her pursuit of a familial relationship with Child.  In Mother's view, had Child been "placed with a family member, he could have grown up with his brother, and Mother could have remained connected to both of her sons[,]" and Child could have been "raised as a member of her extended family."

**{44}**   As discussed later in this Opinion, we remand this case with instructions to the Department to consider placing Child with Colin.  Because Mother's due process argument as to the Department's failure to abide by Section 32A-4-25.1 is grounded in the potential relationship between herself and Child that would arise from his being placed with Colin, any alleged deprivation of that potential should be remedied by the proceedings on remand. Accordingly, we decline to address the merits of this aspect of Mother's due process claim.

### III.   Colin Has Standing to Raise the Issue on Appeal Whether the Department's Failure Requires This Matter to be Returned to the Department to Engage in Consideration of Colin

**{45}**   Before we reach the merits of Colin's argument, we address the Department's contention that he does not have standing on appeal[1] to challenge the court's orders. We

---

[1] Although the Department's argument regarding Colin's lack of standing is ambiguous in terms of whether its view is that Colin lacked standing to raise challenges in the district court or whether he lacks standing to appeal, owing to its particular stipulation to Colin's standing in the district court, we interpret its argument to be that Colin lacks

apply de novo review to the legal question of whether a party has standing. *Rio Grande Kennel Club v. City of Albuquerque*, 2008-NMCA-093, ¶ 7, 144 N.M. 636, 190 P.3d 1131. We likewise apply de novo review to the interpretation of statutes and their application to facts. *Crutchfield v. N.M. Dep't of Taxation & Revenue*, 2005-NMCA-022, ¶ 16, 137 N.M. 26, 106 P.3d 1273.

**{46}** Colin relies, for standing, on his status as a party to the underlying action. He cites NMSA 1978, Section 39-3-7 (1966), which provides that "any party aggrieved may appeal" from "any final order after entry of judgment which affects substantial rights, in any special statutory proceeding in the district court[.]" And he cites *St. Sauver v. New Mexico Peterbilt, Inc.*, 101 N.M. 84, 85-86, 678 P.2d 712, 713-14 (Ct. App. 1984), for the proposition that "[t]o be aggrieved, a party must have a personal . . . interest . . . adversely affected by the judgment." Colin contends that he has standing to appeal as "a party aggrieved by the departmental and judicial disregard of Section 32A-4-25.1(D) embodied in the district court's judgment." (Internal quotation marks omitted.)

**{47}** Colin's status as a party in this case arose from a stipulated order, filed in September 2010, granting him status as an intervenor. *See* Rule 1-024(B)(2) NMRA (governing permissive intervention and stating in pertinent part that "anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common"); *see also* § 32A-4-27(A)(4) (stating that "[a]t any stage of an abuse or neglect proceeding, a person [who wishes to become the child's permanent guardian] may be permitted to intervene as a party"). In pertinent part, the order contained the following stipulations by the Department, among other parties:

> b.      [Colin] is a person within the fifth degree of consanguinity . . . with whom . . . [C]hild might arguably have resided if [Colin's] existence and interests had been ascertained during the course of the search requirements of Sec[tion] 32A-4-25.1[;]
>
> . . .
> d.      [Colin] wishe[d] to adopt . . . [C]hild . . . and reserve[d] his interest in becoming . . . [C]hild's permanent guardian;
>
> . . .
> f.      [Colin] has standing pursuant to Rule 1-024 . . . [because his] claim or defense and the main action . . . have a question of law or fact in common[;]
>
> g.      [Colin] wishe[d] to pursue his rights under the above described laws in [f]urtherance of preserving family connections[.]

---

standing to challenge the court's orders *on appeal*.

16

Because the stipulation referred to Colin's "rights" under the laws cited within the stipulation, including Section 32A-4-25.1, the stipulation reflected an understanding and an agreement among all parties that Colin had legal rights pursuant to that section, among other laws. *Cf. Snyders v. Hale*, 89 N.M. 734, 736, 557 P.2d 583, 585 (Ct. App. 1976) (stating with regard to stipulations that "[i]n all cases of doubt, that construction should be adopted which is favorable to the party in whose favor [the stipulation] is made" (emphasis, internal quotation marks, and citation omitted)).

**{48}** We conclude that Colin has standing to appeal. As reflected in the order granting Colin status as an intervenor, the Department in effect stipulated that Colin had a sufficient legal interest under Section 32A-4-25.1 to seek consideration as a viable placement for Child so as to preserve family connections. The invasion of this stipulated, legally protected interest constitutes an injury in fact supportive of his standing in this matter. *See State ex rel. Children, Youth & Families Dep't v. John R.*, 2009-NMCA-025, ¶¶ 16-17, 145 N.M. 636, 203 P.3d 167 (stating that, in the standing context, the invasion of a legally protected interest constitutes an injury in fact). At the least, given the stipulation, Colin was aggrieved by the departmental disregard of Section 32A-4-25.1(D).

**{49}** Under the circumstances here, with its having stipulated to Colin's intervention in the district court, we reject consideration of the Department's stated concern that "[i]f [Section] 32A-4-25.1 confers rights on Colin . . . simply because he is the . . . cousin of a child in the Department's custody, the statute would confer the same rights on grandparents and all 'other relatives.' " We need "not determine abstract questions of law which do not rest upon existing facts[.]" *Henriquez v. Schall*, 68 N.M. 86, 89, 358 P.2d 1001, 1003 (1961). Colin's stipulated intervention in this case was predicated on his timely efforts to identify and seek stipulation to his right to preserve his family connections and to assert and protect his interest as a relative who should have been considered and may well have been selected as an appropriate placement for Child. We leave for another day whether, in other circumstances or showing of authority, a relative such as Colin may not have standing to raise challenges, either in the district court or on appeal, pursuant to Section 32A-4-25.1(D).

## IV. The Evidence Shows That the Department Did Not Comply With the Statute

**{50}** Section 32A-4-25.1(D) indicates that the Department has a duty to make reasonable efforts to identify, locate, and conduct home studies on willing and appropriate relatives who could potentially serve as placement for a child. What constitutes "reasonable efforts" varies with the factors and circumstances of each case. *Cf. State ex rel. Children, Youth & Families Dep't v. Hector C.*, 2008-NMCA-079, ¶ 24, 144 N.M. 222, 185 P.3d 1072 (discussing the reasonable efforts standard in terms of the Department's duty to assist parents in adjusting the conditions that rendered them unable to care for the child). Although we do not endeavor to define the parameters of the efforts that will, in future cases, be considered "reasonable" under Section 32A-4-25.1(D), it is evident that in this case the Department's efforts fell far below any standard of reasonableness in regard to identifying relatives who may have served as an appropriate placement for Child.

17

**{51}** The Department was aware of Colin as early as January 2010 when he attended a meeting at the Department and expressed an interest in providing care for Child's half brother. Colin testified at the termination hearing that, starting around the beginning of January, Colin began pursuing information about Child by contacting the Department, through Ms. Martin, which he did numerous times, and although Ms. Martin reportedly told Colin that she would "get back" to him, she failed to do so. By April 2010, Colin was a Department-licensed foster parent and was the guardian of Child's half brother. Thus, for at least three months before Child's permanency plan changed from reunification to adoption (January to April 2010), the Department knew about Colin, knew that Colin was interested in Child and, sometime in April 2010, knew that Colin had met Department standards for becoming a foster parent. The Department's failure to consider placing Child with Colin and to alert the court at the second permanency review to Colin's interest in Child, represents a failure by the Department to comply with the statutory requirement of making reasonable efforts to place Child with willing and appropriate relatives.

**V.** **Notwithstanding the Failures of the Department, We Affirm the Second Permanency Order, and We Affirm the Termination of Mother's Parental Rights**

**{52}** We are mindful that the permanency hearing represents a critical stage in abuse and neglect proceedings. *Maria C.*, 2004-NMCA-083, ¶ 29. Permanency hearings determine the direction of the proceedings and, once an adoption plan is ordered, "the course is set for termination[.]" *Id.* ¶¶ 30, 32. In Colin's view, the Department's failure to locate and identify relatives with whom to place Child requires restoration of the case to the point at which the process failed, namely, the permanency stage.

**{53}** The permanency stage represented a significant point of the proceedings in terms of Colin's interest and Child's interest because, had Colin been considered as a potential placement, Child may well have been placed with him as the case progressed toward termination of Mother's parental rights. In theory, such placement would have afforded Colin and Child an opportunity to form a bond and, theoretically, the placement would have increased Colin's chances of becoming Child's adoptive parent. *See* NMSA 1978, § 32A-5-36(F)(7) (2003) (providing that, in adoption proceedings, the court shall grant a decree of adoption if it finds, among other factors, that the best interests of the adoptee are served by the adoption). Furthermore, as Mother suggests, had Child been placed with Colin, he could have grown up with his brother, and Mother could have remained connected to both of her sons.

**{54}** As it was, however, Child remained with Foster Parents, and by the time of the termination hearing, Child had been with Foster Parents for "twenty plus months[,]" he appeared to "have developed a psychological parent-child relationship with [them,]" and he had formed "a strong positive attachment" to them. Because the court also found that "when possible, infants and toddlers should not be moved from a placement that can be permanent and . . . which clearly benefit the child's well-being" and that Foster Parents were willing

18

to adopt Child, the prospect of the court finding in future adoptive proceedings that Colin, rather than Foster Parents, would be the best prospective adoptive parent appears unlikely.

**{55}** We agree with Colin that the Department failed to make reasonable efforts to locate and identify relatives for placement. Nevertheless, because the court's second permanency order did nothing more than change the permanency plan from reunification to adoption, we do not see that it is necessary to reverse or set aside the permanency order, as Colin suggests. Rather, as discussed in the next section of this Opinion, the Department's failure in regard to Colin shall be remedied by the Department doing now what it failed to do at the permanency stage.

**{56}** Moreover, the Department's failure to consider Colin as a relative placement does not provide a basis for overturning the termination of Mother's parental rights. In its decision to terminate Mother's parental rights, the district court acknowledged the Department's failure to consider relative placement by stating that "[p]rior to the [p]ermanency [h]earing in April 2010, the Department had not reviewed the case for relatives or [otherwise] identified any[.]" Nevertheless, the district court concluded that "[t]he failure of the Department to investigate and place . . . [C]hild in a relative placement [was] not relevant on the issue of whether . . . [Mother's] parental rights . . . should be terminated."

**{57}** As indicated in our earlier discussion, the termination of Mother's parental rights was supported by clear and convincing evidence. We are not persuaded that the facts that bore upon the court's decision to terminate Mother's parental rights would have been any different had Child been placed with Colin at the permanency stage. Neither Mother nor Colin have presented any persuasive argument or authority to show that the Department's failures, at the permanency stage, to consider placement with Colin require reversal of the order terminating Mother's parental rights. We agree with the district court's determination that those failures were not relevant to the decision to terminate Mother's parental rights. Accordingly, we affirm the termination of Mother's parental rights.

## VI. The Circumstances Require This Matter to be Returned to the Department to Engage in Consideration of Colin

**{58}** Although we reject Mother's and Colin's argument that the Department's failure to consider Colin requires reversal of the termination order, nevertheless, we do not believe that the Department's lack of regard for the law should go unremedied. As Colin argues, the Department's failure to identify relatives with whom to place Child was not only a violation of Section 32A-4-25.1(D) and related regulations, but it was also an affront to the policy behind their implementation; namely the promotion of family unity. Colin urges this Court to consider "in more human terms" the implications of the Department's failure to make reasonable efforts to place Child with relatives.

19

**{59}** As Colin reasons, "[n]ot only the child, but the family as a unit, benefits when a child is not lost to his or her kin as a result of parental abuse and neglect." According to Colin, owing to the Department's lack of reasonable efforts to search for relatives, he was deprived the opportunity to be considered as a potential placement for Child such that, had Child been placed with him, Colin would have been placed in a more advantageous position for adoption, and Child was deprived of the chance to be raised with his half-brother. Moreover, as mentioned earlier, the Department's failures may have interfered with Mother's potential to remain connected to both of her sons as part of her extended family. Such considerations cannot and should not be minimized. As one commentator explained:

> Aside from the parent-child relationship, the sibling relationship is the most important relationship in a child's development. The emotional bonds between siblings are irreplaceable. If nurtured and maintained, these relationships can provide emotional security, affect the intellectual, social, emotional, and moral development of one another, and offer lifetime companionship. . . . Siblings with a relationship have a better chance of forming lasting friendships with each other and with outside peers. These are just a few of the benefits commentators have ascribed to sibling relationships. They make no mandate that one be alive prior to the other's adoption– a biological bond necessitates at least an attempt to *cultivate* a sibling relationship even where none has existed before.

Christopher D. Vanderbeek, *Oh, Brother! A California Appeals Court Reaffirms the Denial of Necessary Access for Separated Children to Build and Maintain Sibling Relationships*, 13 U.C. Davis J. Juv. L. & Pol'y 349, 378-79 (2009) (alteration, internal quotation marks, and citation footnotes omitted). Thus, the Department's failures had a range of consequences that defy qualitative assessment and that demand remedial action.

**{60}** Colin should have had and should now have an opportunity to be considered as a willing and appropriate relative to provide permanency for Child. Accordingly, we remand for the Department to complete a home study on Colin and otherwise consider the viability of placing Child with him. After the Department has met those obligations, the district court shall hold a hearing to determine the best interests of Child. *See* § 32A-4-25.1(D) (requiring the court to hold a "permanency review" if, when a child's permanency plan is changed from reunification, the Department has failed to make reasonable efforts to identify or locate relatives or to conduct home studies on willing and appropriate relatives with whom to place the child). The Department's evaluation and the court hearing are to be expedited and meaningful. If Child's best interests would be served by being placed with Colin, the court should, accordingly, oversee a transition plan. *Cf. Lance K.*, 2009-NMCA-054, ¶¶ 2, 44 (ordering the court and the Department to oversee a transition plan to return a child to the father after an erroneous termination of his parental rights).

**{61}** On a final note, we emphasize that Section 32A-4-25.1(D) imposes a duty upon the district court to make a serious inquiry into whether the Department has complied with its

mandate to locate, identify, and consider relatives with whom to place children in its custody. *See Benjamin O.*, 2007-NMCA-070, ¶ 34 (recognizing that the preservation of family unity is one of the legislative purposes of the Children's Code). In future cases, such inquiry will not be satisfied by a pro forma ratification of the Department's assertions that such efforts have been made. Nor will the court's or the child's guardian ad litem's duty of inquiry be satisfied by leaving the full burden of locating and identifying relatives to the parents of children in departmental custody who may, for any number of reasons, be unable or unwilling to provide information about relatives. Rather, in order to comply with the relatives search requirement of Section 32A-4-25.1(D), the court must conclude that the Department, through all of its available resources, has met its affirmative duty to "identify and locate . . . [and] conduct home studies on any appropriate relative expressing an interest in providing permanency for the child." Section 32A-4-25.1(D).

**CONCLUSION**

**{62}** We affirm the termination of Mother's parental rights. We remand to the district court with instructions to the Department to complete a home study on Colin and to look into whether he would serve as an appropriate placement for Child. Afterward, the district court shall conduct a subsequent hearing on whether placement with Colin would be in Child's best interest. The proceedings should occur on an expedited basis.

**{63}    IT IS SO ORDERED.**

                                _____

                                **JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**CYNTHIA A. FRY, Judge**

**Topic Index for *State ex rel. CYFD v. Laura J.*, Nos. 31,324/31,374**

**APPEAL AND ERROR**
Remand
Standard of Review
Standing to Appeal
Substantial or Sufficient Evidence

**CHILDREN**
Children's Code

Termination of Parental Rights

**CIVIL PROCEDURE**
Intervention

**CONSTITUTIONAL LAW**
Due Process

**EVIDENCE**
Clear and Convincing Evidence

**STATUTES**
Interpretation
Legislative Intent