2007-NMCA-135

168 P.3d 1129

STATE of New Mexico ex rel. CHIL-DREN, YOUTH AND FAMILIES DE-PARTMENT, Petitioner–Appellee,

v.

BRANDY S., Respondent–Appellant,

and

Ramon L., Respondent,

and

In the Matter of Nicholas S. and Cipriana L., Children.

No. 26,814.

Court of Appeals of New Mexico.

Aug. 24, 2007.

New Mexico Children, Youth & Families Department, Daniel J. Pearlman, Santa Fe, NM, for Appellee.

Jane B. Yohalem, Santa Fe, NM, for Appellant.

Pittman Law Firm, P.C., Judy A. Pittman, Roswell, NM, Guardian ad Litem.

## OPINION

BUSTAMANTE, Judge.

{1} Brandy S. (Mother) appeals from the judgment of the district court terminating her parental rights as to her children, Nicholas S. (Son) and Cipriana L. (Daughter) (collectively, Children). At the close of the termination of parental rights (TPR) hearing, the district court took judicial notice of the case file, apparently in its entirety, which encompassed information from prior judicial review and permanency hearings, as well as the pleadings in the case. Mother presents two issues on appeal: (1) whether the district court relied on matters not properly in evidence at the TPR hearing in violation of her due process rights, and (2) whether the district court's consideration of evidence outside of the record constitutes structural error requiring automatic reversal. Although we disapprove of the practice of taking judicial notice of the entire case file in TPR proceed-

ings, especially following the close of evidence, we conclude that the record in this case does not support the basic premise of Mother's claims, i.e., that the district court actually relied on material facts that were not independently proved at the TPR hearing. We therefore hold that no aspect of the TPR proceedings violated Mother's due process rights or constituted structural error. Accordingly, we affirm.

## BACKGROUND

{2} The New Mexico Children, Youth and Families Department (CYFD) took Son into custody on March 16, 2004, one day following his birth. Mother had been using methamphetamines during her pregnancy and Son was born addicted to methamphetamines. Mother also failed to seek care when her water broke, which resulted in Son developing an infection. On March 17, 2004, CYFD filed an abuse/neglect petition against Mother. The district court clerk issued a summons to Mother indicating that "these proceedings could ultimately result in termination of your parental rights." Mother entered a plea of no contest to the allegations in the abuse/neglect petition, acknowledging that Son was without proper parental care and supervision. The district court entered a stipulated judgment and disposition against Mother on May 13, 2004.

{3} CYFD took custody of Daughter on June 15, 2004, following Mother's arrest on domestic violence charges. Mother again pled no contest and the court entered a judgment and disposition against her with regard to Daughter on August 31, 2004. Mother did not appeal either adjudication or dispositional order. The cases were consolidated by stipulation on November 29, 2004.

{4} CYFD filed a motion to terminate Mother's parental rights regarding Children on July 19, 2005. Among the allegations set forth in the motion are: (1) Mother neglected or abused Children; (2) the district court ordered Mother to cooperate with CYFD and to comply with court-ordered treatment plans; (3) the district court held several judicial review hearings in which the court found Mother non-compliant with her treatment plan and in her efforts to maintain contact with Children; (4) on June 21, 2005, the district court concluded that any further efforts by CYFD to reunify Children with Mother would be futile and thus changed Children's permanency plan from reunification to adoption; (5) Children had lived in the home of a family wishing to adopt them since November 15, 2004; and (6) termination of Mother's parental rights would promote Children's physical, mental and emotional needs. The district court held an evidentiary hearing on the motion on March 1, 2006.

{5} In presenting its case-in-chief, CYFD called several witnesses that testified regarding Mother's compliance with her treatment plan. The first witness, Steven Bran, testified that he conducted drug screening on Mother pursuant to her treatment plan from March 29, 2004, through April 18, 2005. Mother tested positive for methamphetamines and amphetamines 26 times, tested negative 54 times, and failed to show up for testing 62 times. Mother's counsel did not challenge Mr. Bran's testimony in any respect.

{6} The district court qualified CYFD's second witness, Will Parsons, as an expert in psychological evaluations and assessments. Dr. Parsons testified that he conducted a psychological evaluation of Mother on December 1, 2004, and concluded that Mother's "major problems" were methamphetamine dependence and "a personality disorder with a number of mixed characteristics consistent with narcicisstic and borderline personality disorder." Dr. Parsons had recommended that Mother attend a long-term, residential substance abuse treatment program, and testified that a 21–day program would not be a significant benefit to her. Dr. Parsons described the symptoms of methamphetamine addiction as including restlessness, nervousness, "difficulty contacting reality" and difficulty setting goals. According to Dr. Parsons, Mother's personality disorder exacerbated the impact of her methamphetamine dependence on her ability to attend to the needs of others, especially small children. In order for Mother to be capable of properly parenting Children, she would first need to address her substance abuse problem. Next, she would need to

focus on her personality issues by seeking cognitive behavioral therapy. Finally, she would need to focus on parenting issues so that she could set up a structured life in order to properly care for Children.

{7} Scott Wright, a drug and alcohol counselor for CYFD, was the next witness to testify. Dr. Wright assessed Mother for drug and alcohol dependence on March 25, 2004, and concluded that she had a high probability of having a substance dependence disorder and that she needed treatment. Dr. Wright initially recommended that Mother see him weekly for individual and group therapy. Dr. Wright also read Dr. Parsons' report and recommended long-term, inpatient therapy for Mother; Dr. Wright agreed that "21–day programs very seldom have very beneficial effects for methamphetamine use." Mother began individual visits with Dr. Wright on April 15, 2004, and continued the visits through February 21, 2005. However, Mother only attended 15 individual appointments and missed 33 others in that time frame. Over a similar time frame, Mother attended 9 group therapy sessions and missed 39 others. Dr. Wright testified that Mother would need three to six months of inpatient therapy, followed by a solid outpatient program. Mother's counsel did not cross-examine Dr. Wright.

{8} The final witness to testify regarding Mother's compliance with her treatment plan was Art Otero, a senior treatment social worker for CYFD. Mr. Otero testified that the treatment plan ordered for Mother on May 13, 2004, required her to: (1) arrange for an initial screening and assessment with Dr. Wright and follow all recommendations, (2) visit with Son at least three times a week, (3) complete the court-ordered drug screen, (4) maintain a clean and safe home for Children and become financially stable, and (5) complete parenting classes at Casa & Associates. Mr. Otero testified that Mother had lost her HUD subsidy and her home, and that he did not believe she had acquired a new home. Mr. Otero had spoken with Mother about incidents in which police were called to her home and that resulted in her arrest. Mr. Otero further testified that Mother failed to follow through with court-

ordered treatment at the New Mexico Rehabilitation Center (NMRC) on October 21, 2004. Mr. Otero noted that Mother eventually did complete the 21–day program at NMRC, but that she did so on September 20, 2005, after the permanency plan changed from reunification to adoption.

{9} Mr. Otero next testified about a permanency hearing before the district court on March 22, 2005. The district court found that Mother had not been compliant with any aspect of her treatment plan at that time. Mr. Otero had arranged for Mother to attend a long-term, inpatient program in Arizona two days following the hearing. Mr. Otero and others had impressed upon Mother the importance of attending the program and that it would probably be her last chance to get her children back. After missing the first bus that Mr. Otero had arranged for her, Mother took the bus to Arizona the following day. However, after Mother arrived in Arizona, she did not make it to the program. Instead, she took the next bus back to New Mexico. Mother's failure to attend the program resulted in her arrest for a probation violation.

{10} Mr. Otero testified that CYFD decided to change Children's permanency plan to adoption following Mother's arrest. CYFD made this decision because there had been no progress in Mother's treatment plan, Mother was still testing positive for drug use, and she had been in and out of jail 13 times. Mother had not found a job and had not followed Dr. Parsons' recommendation that she attend individual therapy. Mr. Otero felt that he had done everything he could to assist Mother in complying with her treatment plan. Mr. Otero testified that Children were adoptable and that they were currently placed in foster care with Mother's uncle and his wife, who wished to adopt Children. Mr. Otero opined that, after two years of proceedings, it was time for Children to have some permanency, and that they had bonded with their foster parents. Mother's counsel cross-examined Mr. Otero and confirmed that Mother had completed her psychological evaluation with Dr. Wright, and that she completed a court-ordered women's issues group at Roswell Refuge.

{11} Following the close of CYFD's case-in-chief, Mother's counsel called three character witnesses on Mother's behalf: (1) Rose S., Mother's mother, (2) Leonard Lickens, a long-time neighbor of Mother's family, and (3) Scott Arthur, Mother's friend for over ten years. Rose S. testified that Mother had always taken good care of Daughter, although she did "go wrong" when she had Son. Rose S. further testified that Mother was currently able to take care of Children and that Mother could raise Children in Rose's home. Rose S. stated that Mother was not currently using drugs. On cross-examination, Rose S. acknowledged that her home was not approved by CYFD and that CYFD would not allow Children to live there.

{12} Mr. Lickens testified that he observed Mother with Daughter, and thought they had a very good relationship. He also testified that Mother was an excellent cook and that she kept her house looking "immaculate." Mr. Lickens stated that he believed Mother was currently able to take care of Children. Mr. Arthur testified next, and stated that he had not had the opportunity to observe Mother with Daughter. He believed that Mother could properly care for Children and that she was "very ethical and moral."

{13} Mother took the stand following the testimony of Mr. Arthur. She stated that her relationship with Children had not disintegrated. In responding to a question regarding why she failed to attend the long-term program in Arizona, she testified that she "never really understood what they were trying to do with me." Mother testified that she stopped going to therapy sessions with Dr. Wright because he would say things that made her angry. She also stated that she did not think Children should be returned to her right away. Instead, Mother was asking for "one more chance" with her treatment plan. On cross-examination, Mother admitted that she had unsupervised visits with Children, contrary to her court-ordered treatment plan. Mother also revealed that she had not complied with her aftercare program once she had completed the 21-day program at NMRC. In response to questions from the district judge, Mother admitted that Son was born addicted to methamphetamine and that her last drug test was in March of 2005.

{14} After the close of Mother's case, counsel for CYFD requested that the court "take judicial notice of the file." The district judge responded that "[t]he Court generally does take judicial notice of the things that are in the file. There are two files joined by reference, JQ 2004–15 and JQ 2004–27. And the Court will take judicial notice of the pleadings in the file." Mother's counsel did not object to the district judge's statements regarding taking judicial notice.

{15} The district court issued a decision on March 28, 2006. Among the court's findings were that: (1) Children were abused and neglected by Mother under NMSA 1978, §§ 32A–4–28(A) and (B)(2) (2001) (amended 2005); (2) Mother is unable to properly care for Children due to her drug dependency and personality disorder; (3) CYFD made reasonable efforts to assist mother in complying with her treatment plans; (4) despite reasonable efforts by CYFD, the conditions and causes of neglect are unlikely to change in the foreseeable future; and (5) termination of Mother's parental rights is in the best interests of Children. The district court specifically found that, during her testimony, Mother's answers "at times were rambling, nonfocused, verbose and at high speed. Her demeanor and affect were inconsistent with her age, education, experience and present circumstances. Mother also deflected responsibility for her current circumstances on others. For all these reasons, the Court finds her testimony less than fully credible." The court entered an amended decision on April 19, 2006, which included consideration of supplemental testimony by Ramon L., who is Daughter's father and who was also a respondent in the case. The court entered its final judgment terminating Mother's parental rights on May 1, 2006. Mother timely appealed from the final judgment.

{16} On appeal, Mother asserts that: (1) the district court based its decision on matters not properly in evidence at the TPR hearing, which violated Mother's due process rights, and (2) the district court's consideration of evidence outside of the record constitutes structural error requiring automatic

reversal. We first address Mother's claim regarding structural error because a finding of structural error would be dispositive of the remaining issues. Concluding that no structural error exists under the circumstances of this case, we next consider Mother's due process claims.

## DISCUSSION

### I. Standards of Review

{17} Although the standard of proof for TPR cases is clear and convincing evidence, *see* NMSA 1978, § 32A-4-29(I) (2005), we apply a deferential standard of review regarding the district court's findings of fact. *State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 24, 128 N.M. 701, 997 P.2d 833. "[T]his Court will not reweigh the evidence on appeal. Instead, we must view it in a light most favorable to affirmance." *Id.* (citation omitted). Therefore, our standard of review is "whether, viewing the evidence in a light most favorable to affirming the termination of Mother's parental rights, the trial court could properly determine that the clear and convincing standard was met." *Id.* The issue of whether the TPR proceedings violated Mother's due process rights presents a question of law that we review de novo. *State ex rel. Children, Youth & Families Dep't v. Mafin M.*, 2003-NMSC-015, ¶ 17, 133 N.M. 827, 70 P.3d 1266. Similarly, whether the district court's act of taking judicial notice of the case file amounts to structural error is a legal question subject to de novo review. *State v. Rowell*, 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995) ("We review questions of law de novo.").

### II. Structural Error

{18} Mother argues that the district court's reliance on matters not in evidence to terminate Mother's parental rights constitutes "structural error" requiring automatic reversal. Mother points out that the Supreme Court of the United States has found error to be structural when a constitutional violation involves a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (internal quotation marks and citation omitted). "Such errors infect the entire trial process and necessarily render a trial fundamentally unfair." *Id.* (internal quotation marks and citations omitted). Mother asserts that the district court relied on information from pre-TPR proceedings that lacked the full due process protections that the TPR hearing itself provides. Thus, by basing its decision, even in part, on facts presented in the absence of such protections, the district court rendered any protections afforded at the TPR hearing meaningless, which amounted to structural error.

{19} We note, however, that the Supreme Court has found structural error "only in a very limited class of cases." *Id.* (internal quotation marks and citations omitted). In *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the Court noted that total deprivation of a criminal defendant's right to counsel, or trial before a judge who is not impartial, are examples of structural error that defy analysis under the usual harmless error standard. The Court stated that "[t]he entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial." *Id.* at 309-10, 111 S.Ct. 1246. In contrast, the Court in *Neder* held that a jury instruction omitting an element of the offense "does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." 527 U.S. at 9, 119 S.Ct. 1827. The Court therefore reviewed the defendant's claim of constitutional error using a harmless error analysis. *Id.* at 15, 119 S.Ct. 1827.

{20} Assuming, without deciding, that the doctrine of structural error applies to TPR proceedings, we conclude that there was no structural error in the present case. The district court's act of taking judicial notice of the case file did not *necessarily* render the TPR proceedings fundamentally unfair. *See id.* at 9, 119 S.Ct. 1827. As we discuss in further detail below, even though the district court appeared to take judicial notice of the entire case file, the record does not show that the court actually relied on any material facts

that were not independently proved at the TPR hearing. Therefore, we cannot say that the district court's act of taking judicial notice of the case file rendered the TPR proceedings fundamentally unfair. However, our conclusion that structural error is lacking in the present case does not foreclose the possibility that the exercise of judicial notice in TPR proceedings could amount to structural error under different circumstances. We express no opinion on what those circumstances might be, other than to say that the facts of the present case do not support a finding of structural error. We now turn to the question of whether the district court's decision to grant the motion for TPR nonetheless violated Mother's due process rights using a standard due process analysis.

## III.  Due Process

### 1.  Preservation

■ {21} Mother's attorney did not object when the district court indicated that it would take judicial notice of the case file. On appeal, Mother argues that her attorney was entitled to assume that the court was taking judicial notice of the file for "proper purposes only," and that it was not apparent until after the court entered its decision that the court would improperly rely on the documents in the file. Alternatively, Mother asserts that the alleged errors constitute fundamental error and the issue need not have been preserved. We accept Mother's first argument, albeit reluctantly, because it is plausible that the district court relied on the case file for facts not established at the TPR proceedings. However, counsel in future cases should be prepared to object or seek clarification from the court if the file contains facts that have not been established in the TPR proceedings and it is reasonably foreseeable that the district court would cite such facts to support its decision.

### 2.  Due Process in TPR Proceedings

■ {22} "A parent's fundamental liberty interest in the care, custody, and management of their children is well established." *State ex rel. Children, Youth & Families Dep't v. Maria C.*, 2004–NMCA–083, ¶ 24, 136 N.M. 53, 94 P.3d 796. "[B]ecause the right to raise one's child is a fundamental right … termination proceedings must be conducted in a constitutional manner." *Mafin M.*, 2003–NMSC–015, ¶ 18. Termination proceedings must "be conducted with 'scrupulous fairness' to the parent." *Id.* (citation omitted).

■ {23} We evaluate whether a termination proceeding satisfies due process using the balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *Mafin M.*, 2003–NMSC–015, ¶ 19. "The *Mathews* test requires the weighing of Mother's interest; the risk to Mother of an erroneous deprivation through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and the government's interest." *Id.* As mentioned above, Mother's interest in retaining a parental relationship with Children is strong. Likewise, "[t]he State has an equally significant interest in protecting the welfare of children." *Id.* ¶ 20. Therefore, "the decisive issue centers on the second factor of the *Mathews* test." *Id.*

{24} In the present case, Mother does not allege that procedures employed in the TPR hearing itself violated her due process rights. Nor does she allege that the facts established at the TPR hearing are not supported by clear and convincing evidence. Instead, Mother alleges that the district court improperly relied on: (1) facts neither established at the TPR hearing, nor as part of the judicially noticed case file, (2) its own findings in prior judicial review proceedings, and (3) statements made in the pleadings for the truth of the assertions contained therein.

■ {25} Mother first attacks the district court's finding that Daughter was afflicted with head lice. Mother contends that there was no testimony in the TPR hearing supporting this claim, nor was there such testimony in the record proper. CYFD concedes that this finding was not independently established by testimony at the TPR hearing. However, CYFD argues that the district court's finding concerning head lice was not essential to its ultimate ruling on the TPR motion and is therefore not grounds for reversal. We agree. *See Normand v. Ray*,

109 N.M. 403, 411, 785 P.2d 743, 751 (1990) ("Even where specific findings adopted by the trial court are shown to be erroneous, if they are unnecessary to support the judgment of the court and other valid material findings uphold the trial court's decision, the trial court's decision will not be overturned.").

■ {26} Mother next challenges the district court's decision to the extent that it recites and adopts findings from periodic judicial review proceedings that Mother was not in compliance with her treatment plan. Mother claims that her compliance with the treatment plan was "probably the central issue" at the TPR hearing, and that the findings relied upon by the district court resulted from "perfunctory judicial review hearings" that lacked adequate procedural protections for Mother's due process rights. Mother asserts that, before a court's findings can be adopted in a subsequent proceeding, it must be determined whether the parties had a full and fair opportunity to litigate the issues.

{27} CYFD responds by pointing out that only Findings 13 through 17 of the district court's decision make any reference to the judicial review and permanency hearings. CYFD asserts that these references in no way establish that the district court based its judgment on evidence not properly on the record; to the contrary, CYFD maintains that it proved every critical fact necessary to support TPR at the TPR hearing. Findings 13 through 17 are as follows:

13. On July 28, 2004, at the Initial Judicial Review in JQ–04–15 ([Son's] case), Mother did not appear and was found noncompliant with her treatment plan. Specifically, Mother had missed about 1/6 of her visits with [Son] and [Daughter] (who had recently come into custody) and Mother was inconsistent in doing her drug screening.

14. At a hearing held on November 23, 2004, (Compliance Hearing in JQ–04–15 and Initial Judicial Review in JQ–04–27) Mother again failed to appear and was found noncompliant with her treatment plans in both cases.

15. Both Respondents appeared at the next hearing that occurred on January 19, 2005 but the Court deferred findings as to compliance. A revised treatment plan was adopted relating to both parents and both children.

16. At the permanency hearing on March 22, 2005, the Respondent's [sic] were present but both were found to be noncompliant. Specifically, Mother was not consistent with her drug testing but agreed to attempt an inpatient drug rehab program in Arizona called "WINRS" (Mother subsequently went to Arizona but returned the same day). . . .

17. At the Permanency Hearing on June 21, 2005, the Court found that neither Respondent had made reasonable efforts to comply with the treatment plan nor to satisfactorily comply with visitation. At that time, the permanency plan was changed from reunification to adoption.

{28} CYFD notes that the facts recited in Finding 13 were all independently established by the testimony at the TPR hearing. The testimony at the hearing showed that Mother missed an even greater proportion than one of every six visits with Children, Mother was not consistent with her drug screens, and that she tested positive on many of the screens. Finding 14 was supported by evidence independently established at the TPR hearing that Mother was not compliant with her treatment plan in late 2004. Finding 15 simply states that the district court deferred findings as to compliance on January 19, 2005, and is not specifically challenged by Mother, nor does it appear to be prejudicial to her. The facts recited in Finding 16 regarding Mother's inconsistency with drug testing and failure to enter the long-term, inpatient program in Arizona were also independently established by Mother's admissions and other testimony at the TPR hearing. Finally, the facts recited in Finding 17, that Mother had not complied with her treatment plan or visitation requirements, were also independently established by Mother's admissions and other testimony at the TPR hearing.

{29} We agree with CYFD that the references in the district court's decision to judicial review hearings do not establish that the district court relied on evidence that was not properly before it at the TPR hearing. With the exception of the finding regarding head lice, Mother has not pointed to a single material fact-either in the judicial review proceedings or in the pleadings-upon which the district court relied that was not independently established during the TPR proceedings. Moreover, Mother had a full and fair opportunity to contest the issue of her noncompliance-which, as mother admits, was probably the central issue in this case-at the TPR hearing. *See In re Michael R.C.,* 1999–NMCA–036, ¶ 28, 126 N.M. 760, 975 P.2d 373 (questioning whether a district court could rely solely on facts gleaned from judicial review hearings in deciding to terminate parental rights at the summary judgment phase, but noting that the respondent would have an opportunity to be heard and present a defense at a full TPR hearing on remand).

{30} Mother had ample notice that her failure to comply with her treatment plan could result in the termination of her parental rights. She presented testimony at the TPR hearing regarding her compliance with parts of the treatment plan, such as her completion of the NMRC program and the women's issues program at Roswell Refuge. However, she also admitted to her noncompliance with other aspects of her treatment plan during her testimony at the TPR hearing. She acknowledged that Children should probably not be returned to her right away, but instead asked the court for one more chance to work a treatment plan.

{31} The circumstances of this case do not compel a finding that Mother's due process rights were violated. The district court does not appear to have relied on evidence that was not properly established at the TPR hearing. Furthermore, Mother had fair notice of the central issues that were to be litigated at the hearing. She presented a defense through cross-examination of CYFD's witnesses, through the testimony of her own character witnesses, and by taking the stand herself. In sum, Mother has failed to demonstrate that, had the district court

been precluded from taking judicial notice of the case file, "there is a reasonable likelihood that the outcome [of the case] *might* have been different." *Maria C.,* 2004–NMCA–083, ¶ 37. Therefore, the fact that the district court took judicial notice of the case file does not, under the circumstances of this case, necessitate additional procedural safeguards. *Cf. Vanessa C.,* 2000–NMCA–025, ¶¶ 18–19 (stating that the respondent's advance notice of CYFD's intent to seek a finding of futility and her opportunity to contest the validity of judicial review reports reduced her interest in having additional procedural safeguards). For these reasons, Mother's claims regarding deprivation of due process fail.

{32} Although the facts of the case at bar do not support reversal, Mother's argument raises a valid point regarding the risks involved in taking judicial notice of an entire case file in TPR proceedings. We have grave concerns about the propriety of such a practice in light of the requirement of Rule 11–201 NMRA that "[a] judicially noticed fact must be one not subject to reasonable dispute[.]" Because so much is at stake in TPR proceedings, due process requires that respondents have notice and an opportunity to challenge factual assertions that are subject to reasonable dispute. Therefore, in future cases, if the district court feels it necessary to take judicial notice of all or part of the case file, we urge the court to state: (1) what information, specifically, is being judicially noticed, and (2) how the court intends to use the judicially noticed information. This will give counsel for respondents in a TPR proceeding a meaningful opportunity to object, will reduce the risk of the district court relying on facts not properly established at the TPR hearing, and will clarify the record for appeal.

**CONCLUSION**

{33} For the foregoing reasons, we affirm the district court's judgment terminating Mother's parental rights as to Children.

{34} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, Chief Judge and RODERICK T. KENNEDY, Judge.