This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-38909

**STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,**

Petitioner-Appellee,

v.

**GARRETT R.,**

Respondent-Appellant,

and

**JUDIANNE M.,**

Respondent,

**IN THE MATTER OF DIVINITY R.,**

Child.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY
Grace B. Duran, District Judge**

Children, Youth & Families Department
Rebecca J. Liggett, Chief Children's Court Attorney
Santa Fe, NM
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

ChavezLaw, LLC
Rosenda Maria Chavez
Sunland Park, NM

Guardian Ad Litem

**DECISION**

**ATTREP, Judge.**

**{1}**     Garrett R. (Father) appeals the termination of his parental rights to his daughter (Child). He challenges the sufficiency of the evidence to support the judgment of termination and raises four due process-related claims. We affirm.

**BACKGROUND**

**{2}**     The Children, Youth & Families Department (CYFD) took Child into custody in September 2018 because of neglect. At the time, Child was seven years old and living with her mother; Father was in prison. Following an adjudicatory hearing in January 2019, the district court found Child to be a neglected child, as defined by NMSA 1978, Section 32A-4-2(G)(2) (2018). In accordance with NMSA 1978, Section 32A-4-22(C) (2016), the district court adopted a case plan and ordered both parents to make reasonable efforts to comply with it. The plan aimed to remedy the causes and conditions that brought Child into CYFD custody. Among other things, the plan required Father to "participate in visitations at the discretion of [CYFD] upon his release and positively interact [with] and tend to all the needs of [Child,]" and to "maintain housing [and] gain employment."

**{3}**     Throughout the next approximately eight months, Father remained in prison. In that time, the district court conducted an initial judicial review hearing and an initial permanency hearing. Shortly afterward, in August 2019, Father was released from prison. Father began visiting Child over an approximately two-month period, but then stopped, apparently because he lost his home and telephone access. On one occasion, Child was hospitalized after she became very upset about Father's having missed several scheduled visits.

**{4}**     Leading up to a second permanency hearing in November 2019, CYFD reported that Father was on parole and had removed his ankle monitor. Father failed to attend the second permanency hearing, at which the district court found that "CYFD should be relieved of its obligation to assist [Father] in that he has not maintained contact with [CYFD] and [CYFD] has not been able to locate [Father]. Further efforts at this time to assist [him] would be futile[.]"

**{5}**     The day after the second permanency hearing, CYFD filed a motion to terminate the parental rights of Father, as well as Child's mother, alleging, in relevant part, that (1) Father was unable or unwilling to provide Child with proper parental care or control,

despite CYFD's provision of services and support designed to correct that inability or unwillingness; and (2) the situation was unlikely to change in the foreseeable future. In the meantime, in January 2020 Father returned to prison.

**{6}**     At the termination hearing in March 2020, Father testified by phone, and Child did not appear. Ultimately, the district court terminated Father and Child's mother's parental rights, having found, among other things, that Father had not fulfilled the case plan requirements, and having concluded, among other things, that "the causes and conditions of neglect that brought [C]hild into CYFD custody are unlikely to change in the foreseeable future despite reasonable efforts by CYFD and other appropriate agencies to assist [Father] in addressing the conditions which render him unable to provide for [C]hild[.]"

## DISCUSSION

**{7}**     Father alone appeals the termination judgment. He raises two primary issues: (1) there was insufficient evidence to support the district court's judgment terminating his parental rights, and (2) his due process rights were violated in four instances during the course of the proceedings leading to the termination. We address Father's arguments in turn.

## I.     Sufficiency of the Evidence

**{8}**     We begin with Father's claim of insufficient evidence to support the termination of his parental rights to Child. NMSA 1978, Section 32A-4-28(B)(2) (2005) establishes the standard by which termination is decided in this case, providing:

> The court shall terminate parental rights with respect to a child when . . . the child has been a neglected or abused child as defined in the Abuse and Neglect Act and the court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by [CYFD] or other appropriate agency to assist the parent in adjusting the conditions that render the parent unable to properly care for the child. The court may find in some cases that efforts by [CYFD] or another agency are unnecessary, when . . . there is a clear showing that the efforts would be futile[.]

When confronted with a challenge to the sufficiency of the evidence supporting the termination of parental rights, "we must determine whether the district court's decision is supported by substantial evidence of a clear and convincing nature." *State ex rel. Children, Youth & Families Dep't v. Alfonso M.-E.*, 2016-NMCA-021, ¶ 26, 366 P.3d 282. "To meet the clear and convincing evidence standard, the evidence must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *Id.* (internal quotation marks and citation omitted). Substantial evidence "is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *Id.*

(internal quotation marks and citation omitted). "On appeal, this Court will not reweigh the evidence or substitute our judgment for that of the trial court on factual matters or on matters of credibility." *Id.* (internal quotation marks and citation omitted). Rather, "[w]e will uphold the district court's judgment if, viewing the evidence in the light most favorable to the judgment, a fact finder could properly determine that the clear and convincing standard was met." *Id.* (internal quotation marks and citation omitted).

**{9}** Father challenges two findings underlying the judgment terminating his parental rights: (1) "CYFD has made reasonable efforts to assist . . . [Father] to change and/or alleviate the causes and conditions that brought [C]hild into custody"; and (2) "the causes and conditions of neglect that brought [C]hild into CYFD custody are unlikely to change in the foreseeable future despite [those] efforts by CYFD and other appropriate agencies[.]"[1]

**{10}** Father limits his argument on the second finding to a single sentence, contending only that "the causes and conditions of neglect were identified as involving [Child's m]*other's* multiple failures, and Father's failure to protect Child from these failures, due to his incarceration." Not only is it unclear how this circumstance, assuming it is true, bears on the question of whether the causes and conditions of the neglect were unlikely to change, but this argument is undeveloped. It merits no further consideration. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("We will not . . . guess at what a party's arguments might be. . . . [Doing so] creates a strain on judicial resources and a substantial risk of error." (alteration, internal quotation marks, and citation omitted)).

**{11}** Regarding the "reasonable efforts" finding, Father notes that his case plan required him to "maintain his bond with Child and obtain suitable housing." In support of his sufficiency challenge, Father asserts only that: (1) CYFD failed to help him maintain a bond with Child, in that CYFD failed during his incarceration to facilitate communication between him and CYFD and between him and Child; and (2) CYFD should have assisted with his transition out of prison by giving him a phone card and helping him secure housing. Father does not elaborate on these assertions, except by contending that he "was on his own, based on the view that [his] incarceration presented an insurmountable barrier to all assistance."

**{12}** As our Supreme Court has observed, "Section 32A-4-28(B)(2) does not enumerate the specific methods of assistance that are sufficient to constitute reasonable efforts[.]" *State ex rel. Children, Youth & Families Dep't v. Keon H.*, 2018-NMSC-033, ¶ 41, 421 P.3d 814. And on appeal, "our job is not to determine whether CYFD did everything possible; our task is limited by our statutory scope of review to whether CYFD complied with the minimum required under law." *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 28, 132 N.M. 299, 47 P.3d

---

[1]Although Father states he is challenging three findings in the judgment, he provides argument for only two of those findings. We therefore do not consider the third finding, pertaining to futility. *See Nationstar Mortg. LLC v. O'Malley*, 2018-NMCA-029, ¶ 38, 415 P.3d 1022 ("[W]e will not consider bare assertions that are not developed[.]").

859. In undertaking this determination, we consider the totality of the circumstances. *See Keon H.*, 2018-NMSC-033, ¶ 41.

**{13}** As for Father's assertion related to CYFD's reasonable efforts to help Father maintain a bond with Child, Father's argument fails to consider the totality of the circumstances. Instead, his argument focuses on his time in prison to the exclusion of other relevant periods of Child's CYFD custody. Notably, it overlooks the evidence that once Father was released from prison in August 2019, CYFD did facilitate phone calls and visits between Father and Child—until he stopped attending the scheduled visits. When Father's cooperation with CYFD diminished, so too did CYFD's obligation to assist him. *See Patricia H.*, 2002-NMCA-061, ¶ 23 ("What constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting."). And upon entry of the futility finding in November 2019, CYFD no longer had a duty to make reasonable efforts, *see State ex rel. Children, Youth & Families Dep't v. Maria C.*, 2004-NMCA-083, ¶ 23, 136 N.M. 53, 94 P.3d 796; nor did CYFD hear from Father after he was reincarcerated in January 2020. Moreover, Father ignores the efforts, albeit unsuccessful, CYFD made during his initial period of incarceration. The second permanency planning worker assigned to Father's case for almost all of 2019 testified that he tried about once a month to call Father in prison, but was unsuccessful. The worker also recounted his efforts, likewise unsuccessful, to solicit the prison social worker's help in putting his and Child's names on Father's contact list.

**{14}** As for Father's assertion that CYFD should have given him a phone card and assistance finding housing upon his release from custody, he does not explain how the absence of these specific actions necessarily rendered CYFD's efforts unreasonable. Even if CYFD could have done more to help Father upon his release from custody, it is not this Court's job to determine if CYFD did everything within its power to help, but rather to determine whether it complied with the minimum required by law. *See Patricia H.*, 2002-NMCA-061, ¶ 28. Reviewing the totality of CYFD's efforts to assist Father, in light of Father's level of cooperation, we conclude that substantial evidence of a clear and convincing nature supports the district court's finding that CYFD made reasonable efforts.

## II.    Due Process

**{15}** Father highlights four aspects of the case proceedings that he argues denied him due process, but about which he failed to object below. "Normally, a party is precluded from raising an issue on appeal unless the trial court had an opportunity to rule on it." *State ex rel. Children, Youth & Families Dep't v. Steven R.*, 1999-NMCA-141, ¶ 7, 128 N.M. 304, 992 P.2d 317. "We may, however, review issues that were not preserved when they involve fundamental error[,]" *id.*; *see also* Rule 12-321(2)(c) NMRA (allowing judicial review of an unpreserved issue for fundamental error), including in parental-

rights cases.[2] *See State ex rel. Children, Youth & Families Dep't v. Paul P., Jr.*, 1999-NMCA-077, ¶¶ 14-15, 127 N.M. 492, 983 P.2d 1011 (recognizing the application of the fundamental error doctrine in "exceptional cases," including in termination of parental rights cases involving the deprivation of due process).

**{16}** Father has a fundamental, constitutional right to raise his children. *See State ex rel. Children, Youth & Families Dep't v. Mafin M.*, 2003-NMSC-015, ¶ 18, 133 N.M. 827, 70 P.3d 1266. He cannot be deprived of that right without due process of law, a safeguard that mandates "scrupulous fairness" to him in the termination proceedings. *Id.* (internal quotation marks and citation omitted). Whether Father was afforded due process in the circumstances he brings to our attention raises questions of law subject to de novo review. *See State ex rel. Children, Youth & Families Dep't v. Brandy S.*, 2007-NMCA-135, ¶ 17, 142 N.M. 705, 168 P.3d 1129. To resolve those questions, we employ the balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976), *see Brandy S.*, 2007-NMCA-135, ¶ 23, bearing in mind that "[t]he amount of process due depends on the particular circumstances of each case because procedural due process is a flexible right." *In re Pamela A.G.*, 2006-NMSC-019, ¶ 12, 139 N.M. 459, 134 P.3d 746.

**{17}** The *Mathews* test calls for the weighing of three factors. *Pamela A.G.*, 2006-NMSC-019, ¶ 13. "One, the private interest at stake. Two, the government's interest. Three, whether the procedures used increased the risk of erroneous deprivation of the private interest." *Id.* The first factor, as applied here, is Father's interest in maintaining a parental relationship with Child. *See id.* Equally strong is the government's interest in protecting Child's welfare. *See id.* Our analysis, then, focuses on the third factor, the degree to which "additional procedural safeguards would eliminate or lower" the risk of an erroneous termination of Father's parental relationship with Child. *Id.* In the context of that consideration, Father "need only demonstrate that there is a reasonable likelihood that the outcome [of the proceedings] might have been different." *Id.* ¶ 14 (internal quotation marks and citation omitted). As explained below, Father has not advanced any viable due process claim.

## A.    Child's Out-of-Court Statements

**{18}** Father first asserts that admission of Child's hearsay statements, through Child's therapist, violated his right to due process. Considering Father's limited explication of this issue on appeal, we are not persuaded that his due process rights were violated. *See, e.g.*, *State v. Aragon*, 1999-NMCA-060, ¶ 10, 127 N.M. 393, 981 P.2d 1211 (stating that there is a presumption of correctness in the rulings of the trial court, and the party claiming error bears the burden of showing such error).

**{19}** Father contends that even if there was a valid hearsay exception, the district court should have "consider[ed] whether cross-examination of [C]hild—or other

---

2Father asserts that he "may raise these issues as a matter of fundamental or structural error" but then argues only that they amount to fundamental error. Since he does not develop any claim of structural error, we do not reach the issue. *See Elane Photography*, 2013-NMSC-040, ¶ 70.

protections—[were required] to ensure the trustworthiness of the testimony." In support, Father cites *Pamela A.G.*, an abuse and neglect case in which our Supreme Court considered "whether [p]arents' due process rights were violated when [a c]hild's out-of-court statements were admitted without [the p]arents having an opportunity to question or confront [the c]hild." 2006-NMSC-019, ¶ 10. Central to the Court's inquiry was whether the procedures used for the admission of the child's hearsay statements in that case (i.e., evaluation of those statements under the catchall exception to the rule against hearsay) increased the risk of an erroneous finding of abuse, which could lead to a deprivation of the parents' fundamental rights. *See id.* ¶¶ 7, 13-15 (examining this question in the context of an adjudicatory determination of abuse). Although the Court recognized that in-court confrontation is preferred, the Court concluded that, under the circumstances, the admission of the child's hearsay did not violate the parents' due process rights. *See id.* ¶¶ 18, 20.

**{20}**   In making this determination, the Court in *Pamela A.G.* examined the specific child hearsay statements. *See id.* ¶¶ 3-6, 16. We, however, can undertake no similar review in this case. It is not evident to us, nor is it evident to CYFD, what hearsay statements Father finds objectionable. While Father seems to take issue with certain evidence about how Child reacted to contact (or lack thereof) with her parents, he does not identify any particular statement he is challenging; and it is not even clear whether this evidence took the form of Child's out-of-court statements, of which *Pamela A.G.* is concerned. *See id.* ¶ 10. Father additionally complains of statements "concerning alleged neglect by Father that occurred long before CYFD even took custody, [neglect] that was not alleged in the initiating abuse and neglect petition." Again, Father does not identify with any specificity the statements he is challenging. Regardless, we fail to see how the admission of evidence relating to conduct occurring "long before" the abuse and neglect proceedings could have increased the risk of an erroneous termination when such evidence is seemingly irrelevant to the Section 32A-4-28(B)(2) criteria. *Cf. State v. Hernandez*, 1999-NMCA-105, ¶ 22, 127 N.M. 769, 987 P.2d 1156 ("We presume that a judge is able to properly weigh the evidence, and thus the erroneous admission of evidence in a bench trial is harmless unless it appears that the judge must have relied upon the improper evidence in rendering a decision.").

**{21}**   Moreover, Father fails to explain how the admission of these unspecified hearsay statements, in the absence of cross-examination, increased the risk that his parental rights were erroneously terminated. He instead asserts that "credibility was . . . [an] issue . . . yet Father was not permitted to cross-examine Child regarding her allegations, or even submit questions for her to answer." Such bald assertions are not sufficient to make out a due process violation. Here, as in *Pamela A.G.*, Father did not call Child as a witness or ask the district court for permission to question Child, Father does not indicate on appeal what questions he might have asked Child, and Father does not "articulate with any degree of specificity how confrontation of Child would have enhanced the fact-finding process in this case." 2006-NMSC-019, ¶ 15. Moreover, as in *Pamela A.G.*, Father was afforded certain procedural protections, short of questioning Child, including the opportunity to cross-examine Child's therapist (the hearsay

witness), "proper notice, the assistance of counsel, and the opportunity to review and present evidence." *Id.* ¶ 20.

**{22}**   Altogether, these considerations weigh against concluding that Father was denied due process on this basis. *See id.* Any further consideration of this issue would require that we engage in speculation, a practice we eschew. *See Elane Photography*, 2013-NMSC-040, ¶ 70.

**B.      The Safe House Interview**

**{23}**   Father next points to a February 2020 "safe house" interview of Child and, from what we can discern, contends that he was not afforded certain protections under NMSA 1978, Section 32A-4-5(F) (2009) and *Pamela A.G.* when (1) he was not given notice of the interview, and (2) he was not given the opportunity to submit questions for Child to answer at the interview. We again conclude that Father has failed to make out a due process violation.

**{24}**   First, Section 32A-4-5(F) provides that "[p]rior to interviewing a child, [CYFD] shall notify the parent or guardian of the child who is being interviewed," except under certain conditions not applicable to this case. While CYFD concedes that Father was not provided notice, as required by Section 32A-4-5(F), Father does not explain how this lack of notice increased the risk of an erroneous termination—and that relationship is not apparent to us from the record. *See Elane Photography*, 2013-NMSC-040, ¶ 70 (declining to entertain arguments that force the court to resort to speculation).

**{25}**   Second, to the extent Father contends that he was entitled to an "opportunity . . . to ask questions of [C]hild through the safe house interviewer," this contention likewise fails. *Pamela A.G.*, 2006-NMSC-019, ¶ 19. Father, again relying on *Pamela A.G.*, suggests the denial of an opportunity to submit questions to Child at the safe house interview resulted in a due process violation. But his reliance on *Pamela A.G.* is misplaced. *Pamela A.G.* considered whether a father—who CYFD alleged sexually abused his daughter—was denied due process when her out-of-court statements supporting the sexual abuse allegations were admitted at an abuse and neglect hearing. *Id.* ¶¶ 1, 2, 15. In that case, the testimony elicited during the safe house interview directly related to the subject of the hearing and appeal—the sexual abuse of the child. Under those circumstances, our Supreme Court noted that, in the absence of in-court confrontation or other alternative procedures, the safe house interview "*may* provide an adequate opportunity for parents or their attorneys to ask questions of the child through the safe house interviewer." *Id.* ¶¶ 18-19 (emphasis added). Notably, the Court did not mandate that a parent be given such an opportunity.

**{26}**   Here, in contrast to *Pamela A.G.*, there is no indication that the information collected in the safe house interview was germane to the issues to be decided at the termination hearing or the judgment from which Father appeals. According to CYFD, "it appears that the purpose of the [s]afe [h]ouse interview was to determine whether Child suffered sexual abuse by men whom Child met while in the care of [her m]other"—a

contention Father does not refute. To be clear, Father is not alleged to have sexually abused Child. Nor does he challenge the district court's finding of neglect. Under these circumstances, we fail to see what effect additional procedures, through which Father could have submitted questions to Child during the safe house interview, would have had in this case.

**{27}** In sum, given the absence of relationship between the subject of the interview—alleged sexual abuse by other men—and the Section 32A-4-28(B)(2) criteria, Father has not shown that the lack of notice of the safe house interview and opportunity to question Child through the safe house interviewer increased the risk of an erroneous termination. We therefore conclude that Father has failed to raise a colorable due process claim on this basis.

## C.     Notice of the Futility Finding

**{28}** Father next contends that he was deprived of due process when he was not given notice that the district court might enter a futility finding at the second permanency hearing. The court's futility finding stated that efforts to assist Father in complying with his case plan would be futile because of his lack of contact with CYFD and CYFD's inability to locate him. Based on Father's reliance on *State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 17, 128 N.M. 701, 997 P.2d 833, we understand Father to argue that notice was needed so he could defend against the futility finding. We further understand him to argue that the absence of notice affected the outcome of the case because, after the futility finding was entered, "CYFD gave up on Father." Assuming Father was entitled to notice and he did not get it, this issue provides no cause for reversal because we see no reasonable likelihood that the outcome of this case might have been different had he received notice. *See Maria C.*, 2004-NMCA-083, ¶ 37.

**{29}** The question we must ask is whether Father's lack of notice that the district court might enter a futility finding substantially increased the risk of error in making that finding or, ultimately, in the termination of Father's parental rights to Child. *See id.* ¶ 38. We fail to see how it could have. By the time of the second permanency hearing, CYFD had lost contact with Father. Father had stopped engaging in its services, had stopped communicating with his attorney, and was reported to have removed his ankle monitor. Father did not attend the second permanency hearing, and his attorney indicated that he had not spoken with Father since Father's time in prison. These circumstances appear to foreclose any grounds Father may have had for objecting to the finding; without a practical way for CYFD to reach Father, CYFD could not help him, and its efforts would necessarily be futile. In other words, even assuming Father had notice to defend against the futility finding, a substantial decrease in the risk of error in making that finding is not apparent. And Father does not fill this gap by articulating the grounds on which he would have based his defense. *See id.* ¶ 40.

**{30}** Nor does Father establish how the lack of notice might have influenced the ultimate outcome of the case—i.e., the decision to terminate his parental rights. "[A] trial

court's finding of futility does not finally terminate a person's parental rights"; rather, it "result[s] in the removal of a person's expectation to [CYFD]'s reasonable assistance[.]" *Vanessa C.*, 2000-NMCA-025, ¶ 14. Even after the finding was entered, that is, Father was not "consign[ed] . . . to failure[.]" *Id.* He still had an opportunity—between late November, when the finding was entered, and the end of March, when the termination hearing took place—to "protect [his] parental rights[.]" *Id.* ¶ 15. Furthermore, he had an opportunity at the termination hearing to both present evidence of his independent efforts during that period, if any, toward compliance with the case plan and cross-examine witnesses whose testimony supported the futility finding. *See Maria C.*, 2004-NMCA-083, ¶ 40.

**{31}** In sum, given Father's apparent lack of a defense to the futility finding and his subsequent opportunity to contest it, we cannot say that the lack of notice of the futility finding increased the risk of error in making that finding and, ultimately, in the termination of Father's parental rights to Child. We therefore conclude Father was not denied due process on this basis.

## D. The Judge's Review of Prior Hearing Notes

**{32}** Finally, Father contends the district court judge impermissibly relied on or took "judicial notice" of her personal notes from prior hearings in making her termination decision against Father. He asserts this amounted to a due process violation. For the reasons that follow, Father again has failed to establish a denial of due process.

**{33}** In support of this claim, Father cites *Brandy S.*, in which this Court considered whether a mother's due process rights were violated when the district court "took judicial notice of the case file, apparently in its entirety, which encompassed information from prior judicial review and permanency hearings, as well as the pleadings in the case." 2007-NMCA-135, ¶ 1. While *Brandy S.* expressed disapproval of such a practice, this Court held no due process violation occurred. *Id.* In reaching this conclusion, *Brandy S.* took into account that the record did "not support [a] basic premise of [the m]other's claims"—i.e., that the district court "relied on evidence that was not properly established at the [termination] hearing"—and that the "[m]other had fair notice of the central issues that were to be litigated at the hearing" and also presented a defense. *Id.* ¶¶ 1, 31.

**{34}** In this case, even if we assume that, under *Brandy S.*, it was error for the district court judge to review her notes from past hearings, Father does not explain how there was a reasonable likelihood that the outcome might have been different had the judge not reviewed her notes. *See id.* ¶ 31. Nor do we see how.

**{35}** As an initial matter, although it is true that at the beginning of the district court judge's oral ruling, the judge stated that she went through the file and reviewed her notes, whether the record demonstrates, as Father suggests, that the judge relied on these notes in reaching her judgment of termination as to Father is another matter. After the judge stated that she reviewed her notes, she proceeded for the next couple minutes to discuss the myriad shortcomings in Child's *mother's* compliance with her

case plan. Still addressing Child's mother, the judge stated, "Then what we have from the therapist is that this [C]hild has been hurting, and she has been hurting a lot, since September . . . 2018." A minute later, the judge observed that, after visits with the parents, Child had become distraught, not because the visits were ending, but for some other reason not readily apparent from the judge's comments. It is these final two comments relating to Child's mental and emotional well-being during the pendency of this case that, in Father's view, indicate the judge relied on her notes to arrive at her termination decision against him.

**{36}** While it is evident from our review of the judge's oral remarks that she at times referenced her notes when commenting about Child's mother's non-compliance with her case plan, it is not clear that the judge was referencing her notes when she made the remarks about Child's mental and emotional well-being, about which Father complains on appeal. And critically, as in *Brandy S.*, the substance of these remarks was independently established during the termination hearing. *See id.* ¶ 29 ("[The m]other has not pointed to a single material fact—either in the judicial review proceedings or in the pleadings—upon which the district court relied that was not independently established during the [termination] proceedings."). The therapist testified that "[Child's] identified problem areas were adjustment to trauma and mood stability[,]" and that Child's issues were a result of the trauma she experienced while living with her parents. The second permanency planning worker testified that Child was hospitalized after becoming very upset about Father's having missed several scheduled visits.

**{37}** What is more, the evidence the district court judge referenced in her remarks did not directly bear on the central issues in the termination hearing with regard to Father— specifically, whether he could address the needs of Child such that the causes and conditions of her neglect were likely to change in the foreseeable future. *See* § 32A-4-28(B)(2). On those points, the judge observed that Father was back in prison, was unable to care for Child, and had admitted he had not been a consistent parent to Child. Father does not dispute these findings, nor does he contend they were based on the judge's notes and not the evidence adduced at the hearing. Nor does Father dispute that he was given fair notice of the termination hearing and the issues that would be litigated at the hearing, along with an adequate opportunity to defend on those issues. *See Brandy S.*, 2007-NMCA-135, ¶ 31 (recognizing no due process violation where the right to defend on the issues central to the termination hearing was exercised and fair notice of the proceedings was given).

**{38}** In sum, under the circumstances, Father has not shown that there is a reasonable likelihood that the outcome of the termination hearing might have been different had the judge not reviewed her notes. We therefore conclude Father has not established a due process violation on this basis.

**CONCLUSION**

**{39}** For the foregoing reasons, the judgment terminating Father's parental rights to Child is affirmed.

**{40}** IT IS SO ORDERED.

**JENNIFER L. ATTREP, Judge**

**WE CONCUR:**

**JACQUELINE R. MEDINA, Judge**

**SHAMMARA H. HENDERSON, Judge**